Let me start by painting a picture that comes straight out of what Ms. Copeland was recorded saying to the agents when they were the only ones she thought she was talking to, when she had no reason to be saying something just to help herself. And then if you remember, you were the one that suggests me, and you were telling me, and then he came and said, well, the counter-herder, and then I just feel the push, and I told you several times, I told you that I was confused, and I told you that I was tired, and you're just keeping on the questions, and you didn't let me go. What did you expect? You knew I was sweating, and I don't eat snacks. I had to go home. I had to take a shower, and I didn't take a shower. I told you several times. One time I even told you I feel like I'm being attacked. Now, the test, of course, is how a reasonable person would feel, not how Ms. Copeland felt. That's her description of the September 23rd interview? And I condensed those in a closing argument, but those all come out of what she said to the agents, the agents alone, when they interviewed her at her house on November 3rd, and she didn't, of course, know it was being recorded. You didn't answer my question with a yes. Those comments refer to the September 23rd interview, correct? That's her talking about the September 23rd interview. When did she say those things? When she was interviewed in her home by the agents on November 3rd. So the statements about, you know I was tired, you know I wanted to go home, were said after the 23rd interview, when they came to her house a month and a half later? Yes, to some extent, though I think she was also talking about what she had been trying to convey to them, but those words, some of it is what she's saying about what she's... Did she or did she not, during the September 23rd interview, say she wanted to leave? The court found she didn't. So, at least in those words. Now, the court made no finding about whether she said she felt like she was being attacked, no finding about whether she felt like she was being tired, no finding about whether that was apparent. But if I could, maybe I can go to what the agents admitted, Your Honor. Just one more thing. In what you described, she said nine hours. It was actually seven, wasn't it? Well, the court found it was at least seven. That's what the agents admitted. The court didn't find it was not nine. But what we have with what the agents admitted are several things that I think are far and away enough by themselves. The agents admitted they had Ms. Copeland in their office interrogating her for seven hours, though they offered her the bathroom water and food. They used the word interrogation? No, they didn't use the word interrogation. I don't know if I've ever heard an agent use that, Your Honor. Well, you said they admitted interrogating. They admitted they had her in the office for over seven hours, though they offered her the bathroom... Signal to stop. You know, these people who bring cell phones into the courtroom. I think they get sanctioned, don't they, Your Honor? You do. I love that music. The agents admitted they had her in the office. I guess that was one of my former law clerks who's a law professor. That's how he gets all his rulings. That's how I get my rulings. The agents admitted they had her in their office questioning her for over seven hours or at least seven hours. They admitted that they offered her the bathroom water and food, but all she had was one trip to the bathroom at the start and I think one bottle of water. They admitted that they confronted her and or contradicted her, what the district court characterized as, quote, ad nauseum, unquote, and found was many more... I think we're familiar with what the record shows. The thing that bothers me is that on its face, seven hours in a questioning situation raises enormous questions, at least for me. If somebody's there for seven hours, that's not the way one normally would choose to spend their day under any circumstance. But our case law isn't absolutely clear that seven hours alone would be enough. So when you say she only went to the bathroom once or twice, the focus really is on what were the conditions in terms of her understanding that if at any time she wanted to, she could say, look, I've had enough, I want to leave. What the case law focuses on, the case law lists five factors. So I'm asking you, instead of telling me what she didn't do, the question is, was it she didn't do because she has a strong bladder and doesn't need to go to the bathroom a lot or she didn't ask or what was it that under the circumstances prevented her from saying, look, I've been here enough, I'm leaving? The fact, well, the fact, there are two factors, I think. I started to say the fact that she was there seven hours, but that's implicit in the court's question. The two facts that we have here that I think distinguish it from the Ninth Circuit cases and make it actually very much like the Lee case that I'd like to talk about in a minute are two. One is that it was at a police station. Now, that clearly is not enough under the case law, but there's certainly no Ninth Circuit or Supreme Court case that comes close to approving a seven-hour questioning, I'll call it an interrogation, whatever one wants to call it, at the police station. More than that, though, I think the key factor here is that she was continually, in the words of the district court, ad nauseum, confronted with contradictions and inconsistencies and what I think is fair to call accusations. She was confronted about having an affair with Lee Hatch. She was confronted about inconsistent statements about how Hannah Hatch was cared for, where Hannah Hatch slept, and other such matters. She was reminded about bruises throughout Hannah Hatch's body. Now we've got the techniques. Now what about my question? What was it about the circumstances that you're saying convinced her or persuaded her, objectively would have persuaded her, that she was not free to say, I don't like what you're doing, I don't want to talk to you, I'm leaving? I think what the case law says is that is implied in an implicit result or effect of having someone in a police station for seven hours where you're grilling them and confronting them in that manner. So you're relying on the ambient circumstances, but there was never anything telling her she couldn't go. There was no refusal to give her permission to go to a bathroom or anything like that. There's no evidence of that. On the other hand, she didn't expressly say, I want to go, nor did they expressly tell her that she was free to go. Correct. Except they did at the very beginning. The other part of my question, so you can focus on it, would be, all right, let's suppose that we were to agree with you that she was in custody and there was a Miranda violation. You aren't arguing fruit of the poisonous tree, as I understand it. And the reasons for that, if I'm using that word, were improper, and therefore whatever came out of the September interrogation had to have been suppressed. Assume that that is done, then is there anything, at least with respect to the child abuse claim, that sustains the conviction on the child abuse claim based on the number of years she was in custody? Is the court talking about a harmless error analysis? You'd have to find it was harmless beyond reasonable doubt. And one of the key things that she said in this September interrogation, I did want to bring the court back to the Lee case, by the way, that's similar to our facts here. But one of the key things she admitted, and the government sort of tried to disavow this in their closing argument, is not necessarily their theory. But it was there in front of the jury. One of the key things she admitted at the end, when she was finally, the way I would put it, was broken by the agents, was that she picked the child up violently and swung her and struck her head against the countertop. That was after she initially said she struck her head against the wall. Those were two suggestions the agents offered to her, and she agreed with one and then the other. Was that the same statement presented to the jury? Yes, and it was also in a written statement, though perhaps a little less strong in the written statement than as it was described by the agents in the form of an oral admission. I would submit that you can't find that's harmless beyond a reasonable doubt, even though the government in its closing argument sort of said, we're not saying she just picked the child up and went click, click, against the counter. I don't think that eliminates the possibility of the jury concluding that that's what happened here, especially when the government offered no alternative explanation about how she was injured. The government basically just left it for the jury to sort of say it must be Ms. Copeland, because Ms. Copeland was the only one there and it must have happened not accidentally, because at least our experts claim it couldn't be non-accidental, which of course gets into the expert testimony issue. So I don't think you could find the admission of the September 23rd statements, Your Honor, to be harmless error. In that regard, how do we fold into, following up on what Judge Fischer asked you, how do we fold into any harmless error analysis the fact that our case law tells us, under the Mitchell case, I think it is, that even if we find the September 23rd events to be an entirely improper interpretation of the facts, how do we do that? That, of course, would be harmless only as to the false statement count, not as to the assault count. And the problem, Your Honor, is the way you prove a false statement, of course, is by showing the faking of the false statement and then showing it's false by showing other evidence that it's false. A major part of the government's evidence that that statement was false was her admissions later on in the same interrogation on September 23rd to the opposite. So the equation there is she says one thing the first time and then she says something different the second time that shows the first thing is false. Well, the second thing she says is part of what would have to be suppressed from the September 23rd interrogation. Now, there were some admissions in the November 3rd interrogation, of course, we're arguing that also was... I may be refining this down too much, but if the government had in fact only introduced the statements that they claimed to be false from the first interview and then used other evidence to show that they were in fact false or to infer that they were in fact false, isn't that right at harmless error? Yes, the Mitchell case suggests there might be a substantive defense, but it would be harmless error in terms of just pure suppression. But that's not what we have here because a key part of showing the false statements were false was that they then confronted her and got her to admit it really wasn't that way, at least the way they characterized what she said. Now, she did make some additional admissions later on in the November 3rd interview. She did make the September 23rd harmless because you didn't have two admissions instead of one that it was false. And I think arguably the November 3rd admissions were a little less clear. They were certainly more removed in time. It's your argument that both interrogations should have been suppressed. Correct, though they're obviously different factual scenarios. Talk about the November interview. Yes, could I point out, though, could I go back to the Lee case on the September 23rd interrogation? Because I did want to just when I look back at that case, which is acknowledged by the government. I'll tell you how to use your time. It's clearly your best case. We've read it. The Lee case. We understand it. Then I'll leave that, Your Honor. I'll take that signal. The September 23rd, the November 3rd interrogation, it's... This was at her home. It's at her home. It was a month and a half later. And we have a recording, so there's no dispute about what was said. And I would submit that what was said was, I mean, the government tries to parse it and explain it. But what she said was, quote, I don't want to talk to you without having some other protection. She's saying she doesn't want to talk to them. She then goes on to explain why, because I don't know the rules and I don't know what to say and I'm very ignorant. And that's the reason I just, you know, I don't feel like I want to talk to you. But she goes on and talks to them. She does. But they ignore, the problem is they ignore her saying, I don't want to talk to you. They start asking her, well, you know, they basically just ignore them. Are you required to say, do you want us to leave? The answer is no, isn't it? They're not required by Miranda or something like that. I think, though, that that tends to make the setting a coercive type of setting. You can have custodial interrogation in the home. There's at least one Supreme Court case that recognizes that, and I think there's other cases, too. The question is basically the atmosphere. And I guess what I'd submit is when you ignore someone's statement, they don't want to talk to you, it's sort of like, what are they supposed to do? What's she supposed to do? I mean, walk out of her home and leave them there? So I guess I'd agree it's a weaker case than the interrogation in the police station. But when they just ignore what she wants to do, I think that's a problem. Maybe just one point on the expert testimony, Your Honor, and then I'll try to save the rest of my time for rebuttal. The one that I think is most troubling is letting doctors testify to the conclusion that it was a non-accidental injury. The problem is that there's three steps in that reasoning, and the third step is one that's for the jury. The first step is one they're experts in, what kinds of forces could cause the injury. The second is a step that they're experts in, what kinds of forces can't cause the injury. A fall from the chair, the doctors testify. The third step is basically it must be the non-accidental kind because we didn't get any explanation of accidental injury, and in fact she gave us an explanation that we think is false, falling from a chair. That's the job of the jury, and that's something that the doctors don't have any special expertise in and so shouldn't have been allowed to testify to. And what you end up with, of course, is you end up with this expert imprimatur on the government's theory that the injury was non-accidental, which is basically their whole theory. There are other issues, but I'm down to about four minutes, so I'll save that for rebuttal if the court doesn't have questions. All right. Thank you. Thank you. Good morning. Andrew Brown for the United States. Let me ask you a question, if you don't mind. The military and the FBI have been giving suspects in custody Miranda warnings for probably over 100 years or maybe 90 years. Even before Miranda? Even before Miranda. And I think the code of military justice requires them to do that now, and it's a very simple thing to do, as you know. And so I'm wondering, why didn't they do that here? Why didn't they just tell her what her rights were and maybe we wouldn't be here on this? I think that's a good analysis, and I wish the agents had. But the agents didn't tell her her Miranda rights, and they weren't required to. And so the issue becomes, was she actually in custody? And there are a number of factors here that show that she was not. The test, of course, is whether she was under formal arrest or a restraint on her freedom of movement that was so significant it was akin to formal arrest. She went to the NCIS offices on her own steam with her housemate. That's the same way she left. The district court specifically found that there was no coercion whatsoever in getting her there, and they had simply asked her if she would come down and voluntarily give a statement, and she did. She was free to move around NCIS offices unescorted. Was she told she could leave? Yes. Yes, at the beginning she was told she was free to leave. Those words were used? Yes. You're free to leave at any time? Sometimes. I can't remember if it said at any time. Sometimes agents, officers say that, but they don't mean it. Were they asked about that? Not that I recollect, but of course. Were they asked in sum and substance if she had at that point gotten up and left, would you have allowed her to do it? No one ever asked that, Your Honor. The defense tries to argue that notwithstanding her being informed that she was free to leave and coming and leaving on her own steam and wandering around the offices for the bathroom break on her own, that there was still a ---- Wait a minute. When you say wander around the office, what's the setup? That sounds like something they didn't say if you want to go to the bathroom. It's right down here. It's on a different floor. So the agents described to the defendant how to go down the stairwell, turn left, et cetera, to go to the floor to get to the bathroom, and she did, and then she came back. So the defense tries to get around these by arguing two things. First, that she was confronted with inconsistencies in her story, and second, that the interview was very long. As to being confronted with inconsistencies in her story, that's surely true. But, of course, in all police interviews, when somebody tells them information that is contradicted by other information they have, it's their duty to explain that to whoever they're interviewing and try and resolve the conflict, which is exactly what they did here. There's a difference between an interview and an interrogation, isn't there? I suppose. And if you get consistently asked about inconsistencies and how can you say this and the medical evidence says this and that sort of thing, it becomes more of a law and order type interrogation, doesn't it? Yes. I think that the difference between an interview and an interrogation is it's really a conclusion as to the manner in which the questioning was carried out. And if there was surely harm, terrible harm to this child, the only person in a position to have done it was the babysitter, right? That's all that the agents knew of at that time. That they knew at that time. Right. It was not where the parents had come home briefly or the father had come home briefly or whatever. She was alone with the kid. The father had come home for a lunch break and the father had come home before the paramedics arrived. As it turned out, when they developed all the facts and interviewed the father's co-workers and checked the cell phone records, he wasn't present at the critical moment, but he had returned to the house. In the mind's eye of these NCIS agents, she was the only potential subject if it was on accident. Well, I guess I wouldn't go quite that far. I would certainly say she was the prime, but the agents did suspect the father for a time. They checked out these other things, but in terms of who was prime suspect, she was it. Yes. And it lasted seven hours. Yes. Do you have a reported case from this or any other circuit where an interrogation or questioning lasted seven or more hours? Yes. It was held noncustodial? Yes. And which case is that? That's the Pagan-Settini case from the First Circuit where he was interviewed for nine hours. Isn't that a case where he was repeatedly told he could leave? Yes, it is. And repeatedly said, no, I want to stay here and answer your questions? Exactly, Your Honor. And then there's also, I'm going to butcher the pronunciation, but there's the Chikre case where the defendant was interviewed at his home for seven hours. What circuit is that? I want to say, thank you. And in that case, there was an unusual degree of government control because the government wanted to use him as a cooperator in the field. And so they actually followed him around his own home from every room to ensure that he did not call his co-conspirators and alert them to the arrest. What's the longest one in the Ninth Circuit? Your Honor, I can't answer that. Most interviews that come up tend to be under two hours. Right. Isn't there one where we said 90 minutes was too long? I know that there have been a number of interviews which have been even shorter, where the court has held that they were custodial, but I didn't understand them to turn on the length of time per se as opposed to all the other factors that were involved. When the defense argues that the nature of the questioning made it custodial, they ignore the Matheson case, which, of course, was the Supreme Court. And in that case, the officers lied to the interviewee and said, we found your fingerprint on the scene. And the Supreme Court said that that had, quote, nothing to do with whether the defendant was in custody. Similarly, in the Norris case, which is in the Ninth Circuit. Could I just footnote the Eighth Circuit case? The court goes to pains to point out that the abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody, that a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So like the First Circuit, the Eighth Circuit was relying on repeated admonishment. That didn't exist here. Well, that's not true, Your Honor. The agents testified that they had given her the advice repeatedly, and the defendant admitted hearing it once, and the district court never said, I find that it was repeated, as the agents say, or I find it was once. As the defendant said, I was just going with the once because that's the only one that the defendant admitted to and therefore the only one that is absolutely solid. But the interrogation wasn't recorded. The September 23rd interview was not recorded. Was English her first or second language? Second language, but her own psychologist testified that she was bilingual. One thing that I think is clear. How old was she? I'm sorry? How old was she? Mid-30s, early 30s. At the time of the interview? Yes. Was there a – does the record tell us whether the NCIS agents had access to legal counsel? There's nothing in the record about that. Or where the JAG office was on this naval base? It was a naval base, wasn't it? That's right, Your Honor, although it wasn't going to be a military prosecution because she's not a member of the military. I understand that. I just wondered if the JAG office was nearby. I don't know, and there's nothing in the record about that. Any question in your mind that if they'd called you and said they planned to question this subject for seven hours but not Warner, that you would have told them to Warner? Of course I would have, Your Honor, but surely they didn't know it was going to last seven hours. And I think one of the most important factors is to understand why the interview was so long. And that was determined by the defendant. First, she did not answer questions promptly. She would sit and think. Sometimes she would take long pauses. Sometimes the interview would just go. We know that. It's in the record, Your Honor. That's the suppression testimony for the May 4th reporter's transcript, page 120. Julie McGuire testified to the long pauses and stops that occurred during the interview. And, indeed, it's even in, inferentially, what Mr. Gunn read you earlier, where the defendant talked about how there would be times where they would simply look at each other's eyes. I think we've probably beaten the 23rd to death. Assume that just for the purpose of this question, that we feel that the September 23rd interview should have been suppressed. What's your harmless error argument? And when you answer that question, I've looked in your brief, and I noticed that the red brief, I noticed that the reply brief makes the same initial assumption I did, is that you weren't arguing harmless error as to child abuse. You mentioned it, but there's no analysis. So it would be helpful to be specific. Defense counsel misunderstood the harmless error argument that I was making. I was not dividing between the 1001s and the abuse. I was dividing between the September 23rd interview and the November 3rd interview. If Your Honors find that the September 23rd interview was custodial, you should still affirm this case. And the reason for that is defendant made no admissions in September 23rd that weren't also present in November 3rd. As to the child abuse. Right. Or as to the false statements, even. What she says in September 23rd is essentially in her handwritten statement, I loved the child like my own. I took care of her. I educated her. It's all self-serving. It's all exculpatory. She does make the 1001 lies. And she does admit in the September 23rd interview, at least implicitly, that her statements that were false were, in fact, false. So you're telling the panel that if the district court had granted the motion to suppress as to the 23rd interview and restricted your proof just to the statements from that interview that the government alleged to be false, there was sufficient content in the November in-home interview to demonstrate the falsity of those statements? Far stronger. Because in the September 23rd interview, all you have is the agents say she said this, the agents say she then contradicted herself. On the November 3rd interview, you have it on tape. And this is at page 25 of the government's brief. It's on tape. Did she know it was being taped? No. What? No. In the November 3rd interview, on tape, the defendant says that she was frustrated and upset with Hannah Hatch. And, of course, on September 23rd she said, oh, I wasn't mad at the child. And then she also said, again, on tape on November 3rd, that the bruises on the girl's back and hand and arms were from her. And you'll recall in September 23rd she said, I never struck her anywhere but the bottom. And also in September 23rd she said, I never struck her with anything other than my hand. And then on November 3rd she says on tape that she used the, quote, little kitchen thing, which we understand to be the spatula. Thank you. To discipline her. So all the 1001s are proved far more strongly by the tape on November 3rd than they are by her having made those admissions on September 23rd. And, again, she doesn't make any true confessions on September 23rd. The worst that she ever says is, well, picking up the child, I accidentally bumped her head. Well, for the child abuse charges, of course, we have to prove that she acted willfully. So her statement is one of complete innocence in September 23rd. The only reason the government offered that is the government was trying to show that she was a liar, that she had something to hide, and that her story kept changing. Surely there's nothing in September 23rd that could convict her. It's all self-serving. And I think that gets back into why the interview was so long. You were using what you got in September 23rd to interrogate her on November 3rd. And if the September 23rd interrogation goes out, then how is it that you think you can use what she said then to show that she lied on November 3rd? Her November 3rd interview is a complete recanting of September 23rd. She starts off in November 3rd by saying, what I told you there, that's not true. It's a lie. You knew it was a lie. You made me say it. So there is no fruit of the poisonous tree. It's quite the reverse. She is disclaiming or denouncing everything she said in September 23rd and starting over again. And the agents there ---- What was the reason for not telling her that the conversation on November 3rd was to be recorded? It's not in the record, but I'm quite sure it was so that she would not make her statements ones that she knew were going to appear in court later on, which would have, I'm sure, chilled her candor. Short answer is, didn't have to. Right. And, again, I think the most important thing is, why was it so long in September 23rd? And it's because she was trying to convince the agents. Her test was, I want to get in no trouble and I want to convince the agents that what I'm telling is true. So first when she comes in, she says, oh, you know, I was going to get the ice cream to motivate her. She fell behind my back and never saw it. Well, that's usually why suspects tend to go along, because they think that they're going to beat the rap or whatever. But the Miranda principle is there for a reason to make sure that the person is fully advised by legal counsel. And coming back to Judge Pragerson's opening question and your appropriate response that it would have been better had they done so, we're spending a lot of time recreating events after the fact when all they had to do at the outset was give the Miranda warnings. So I think that's troublesome. Well, that's absolutely true. It laid the blame on her for seven hours of duration because she took time to think about her answers. I'm not sure how that cuts. Yes, Your Honor, I was trying to answer your earlier question. I understand you were trying to answer it. My reaction is it doesn't persuade me very much. We know from past cases that it may even be present policy for some time the policy of the FBI has been not to take any interrogation. Is that the policy of the NCIS? I'm just going by memory, Your Honor. All I can say is I came in the case between September 23rd and November 3rd, and I told them go and tape the interview for November 3rd. I can't remember if that was against their policy. They didn't argue about it? I actually kind of think we did, Your Honor, but I don't want to say that. It wouldn't surprise me if you didn't. Because I'm just not sure. The U.S. attorney in Arizona was fired ostensibly in the December 7th incident, allegedly because he was demanding that FBI agents record statements in sexual abuse cases arising in Indian country. Okay, just wanted to know. Well, I see that I am done with my time, Your Honors. Thank you for your argument. Thank you. I looked through the record and I found answers to, I think, at least one of the court's questions. I think, Judge Hawkins, you asked if the agents were ever asked what they would have done if she had said, I want to leave. It wasn't quite that, but they were asked what would you have done if she had said something like she said in the tape recorded interview of, I don't want to talk anymore. I'm not quoting exactly. And if you look at excerpt of record, page 111, which actually follows several other pages of back and forth, at the bottom it says, and there's some resistance before we get there, but the following exchange takes place. Would you have stopped the interrogation if she said that on September 23rd, word for word, that referring to what I had read from the tape recorded transcript? Answer, I'm not sure. Question, you're not sure? Answer, I might have asked for clarification. The court, you are not sure one way or the other? The witness, it's just the two interviews are completely different context. The court, the question is, can you tell us at this time whether or not you would have? You can say yes or the witness, I might have. The court, or I don't know. The witness, I might have asked for clarification. Down a little bit further, you're not sure, are you? It's going back in judgment. You're not sure what you would have done, right? Answer, yes. I submit that we have a pretty good idea of what they would have done from what they, in fact, did in the tape recorded interview on November 3rd. But that's the testimony you have in the record from the agent. I addressed the Pagan-Santini and the Citre cases in my reply brief. I think the court, those I would submit are very factually different. I won't go over that again because I'm sure the court's seen it. The longest, I'm not even sure. I'm not sure there's a Ninth Circuit case where there's ever been a station-to-house interrogation over an hour that was over-upheld. There's certainly never been one that's been over two hours, nothing close to seven hours. On the harmless error issue, there were certainly, as to the assault issues, there were nowhere near the sorts of admissions that there were in the September 23rd interview. You have to understand what she admitted, at least one interpretation of the jury. She admitted she picked up the child, swung her violently, and hit her head against the counter. The willfulness requirement is only as to the assault, not as to the great bodily injury resulting in coma. That just has to be a result, a causation connection. So a jury could have found that the picking up violently was an assault of sort of conduct and then the injury resulted. We obviously don't know what the jury was thinking, but I don't think there's nowhere near that kind of admission in the November 3rd interview. Basically what she's saying in the November 3rd interview, at least one fair reading of it, is she's speculating about how it might have happened. You might remember that one of our big points for the defense was she has this dissociative disorder and she couldn't remember and was basically trying to reconstruct. As to the false statements, Your Honor, you can read the records for yourself, obviously. There were some admissions that X was true when she had said not X in the September 23rd interview. On the other hand, I would submit most prosecutors always like to have two admissions that something's false instead of one because two admissions that something's false makes your case stronger. And I think when you're talking about harmless error beyond a reasonable doubt, which is the standard we're applying in this context, you can't say that having two instead of one is harmless. And at the very least, that was something that was added by the September 23rd interrogation. My recollection, well, I'll submit it unless the Court has other questions. I think I'm just ending. Thank you. Thank you, Your Honor. Thank you both. Now, you're in trial, Mr. Gunn, right now? Yes, I am. We're starting back up at 11 o'clock. They only gave you half a day to come argue? Well, Your Honor, if we're nice enough, we'd like to go first. Okay. Judge Pease likes to open at 8.30 for 2.30 scheduled. Good luck. But I am only the second sheriff, so I can't. But at least you're in trial. I mean, the vanishing trial seems to be a bit… You know, that's the way we feel. All right. Let's see. We'll call the next matter.
judges: Pregerson, Hawkins, Fisher